NO. 12-05-00063-CV
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
RANDY LOFTIN, INDIVIDUALLY AND       §                 APPEAL FROM THE 369TH
IN HIS OFFICIAL CAPACITY AS A
TEXAS DEPARTMENT OF PUBLIC
SAFETY OFFICER, BARRY EVANS,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS A TEXAS DEPARTMENT
OF PUBLIC SAFETY OFFICER, THE
TEXAS DEPARTMENT OF PUBLIC 
SAFETY AND THE STATE OF TEXAS,        §                 JUDICIAL DISTRICT COURT OF
APPELLANTS

V. 

MISTY MORALES, INDIVIDUALLY AND
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF DONNA MORALES,
APPELLEE                                                        §                 CHEROKEE COUNTY, TEXAS
                                                                                                                                                            
OPINION
            This is an interlocutory appeal of the denial of a motion for summary judgment in a personal
injury and wrongful death action. Appellee, Misty Morales, individually and as personal
representative of the Estate of Donna Morales, sued Appellants, Troopers Randy Loftin and Barry
Evans, each individually and in his official capacity as a Texas Department of Public Safety Officer,
the Texas Department of Public Safety (DPS), and the State of Texas for damages resulting from her
injuries and her daughter’s death. On appeal, Appellants assert that the trial court erred in denying
their motion for summary judgment because they proved the elements of official immunity and
Morales failed to provide sufficient controverting evidence to defeat the motion. We affirm.
 
BackgroundOn May 14, 2001, Troopers Loftin and Evans observed a purple Ford Probe traveling
seventy-four miles per hour in a fifty-five mile per hour zone. The driver accelerated when Loftin,
who was driving the patrol car, activated his emergency lights to stop the vehicle. The troopers
pursued the vehicle at speeds up to one hundred miles per hour. They traveled over rural farm-to-market roads, through Eagle’s Bluff golf course, and into a rural residential community. While in
the residential area and traveling fifty or sixty miles per hour, the patrol car struck a pickup driven
by Misty Morales. Her five-year-old daughter, Donna, was killed as a result of the accident. Ms.
Morales, invoking the Texas Tort Claims Act, sued alleging that the troopers negligently caused the
death of her daughter as well as her own physical injuries, mental anguish, loss of earnings and
earning capacity, physical impairment, disfigurement, and loss of enjoyment of life. Donna’s father,
Arnulfo Morales, filed a plea in intervention seeking damages he suffered due to mental anguish and
the destruction of the parent-child relationship.
            Appellants filed a motion for summary judgment claiming entitlement to judgment as a
matter of law under the doctrine of immunity. They supported the motion with affidavits of Loftin,
Evans, and accident investigator Don Willingham, and excerpts from Loftin’s deposition testimony. 
Morales responded, supporting her response with her own affidavit as well as those of Loftin, Evans,
and David A. Lysek, her expert, and Loftin’s and Evans’s complete deposition testimony. The trial
court denied the motion and Appellants filed this interlocutory appeal.



 
Immunity
            Appellants contend the trial court erred in denying their motion for summary judgment
because Troopers Loftin and Evans are, as a matter of law, entitled to official immunity. They argue
that the officers acted as reasonably prudent peace officers when attempting to stop and apprehend
the driver of the Probe. They contend the summary judgment evidence shows the officers reasonably
believed that the need to immediately apprehend the suspect outweighed the risk of harm to the
public. Further, they assert Morales did not meet her burden to controvert Appellants’ summary
judgment proof on the issue of good faith. Morales responds that Appellants did not establish that
they were acting in good faith and that contradictory statements in Loftin’s affidavit and deposition
testimony raise fact questions.
Standard of Review
            To obtain a summary judgment, the movant has the burden of showing that there is no
genuine issue of material fact and that he is entitled to judgment as a matter of law. Tex. R. Civ. P.
166a(c). In deciding whether there is a disputed material fact issue precluding summary judgment,
evidence favorable to the nonmovant will be taken as true. Nixon v. Mr. Prop. Mgmt. Co., 690
S.W.2d 546, 548-49 (Tex. 1985). Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. Id. at 549. Summary judgment for a defendant is
proper when the summary judgment evidence negates an essential element of the plaintiff’s cause
of action as a matter of law or conclusively establishes all elements of an affirmative defense as a
matter of law. See Black v. Victoria Lloyds Ins. Co, 797 S.W.2d 20, 27 (Tex. 1990). Once the
defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts
to the nonmovant to produce controverting evidence raising a fact issue as to the elements negated
or the established defense. Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995).
Applicable Law
            Official immunity is an affirmative defense that protects government employees from
personal liability. Univ. of Houston v. Clark, 38 S.W.3d 578, 580 (Tex. 2000). When official
immunity shields a governmental employee from liability, sovereign immunity shields the
governmental employer from vicarious liability. Id. A governmental employee is entitled to official
immunity for the performance of discretionary duties within the scope of the employee’s authority
provided the employee acts in good faith. Id. Because official immunity is an affirmative defense,
to obtain summary judgment on official immunity, the governmental employee must conclusively
prove each element of the defense. Id.
            Actions that require obedience to orders or the performance of a duty to which the actor has
no choice are ministerial. City of Lancaster v. Chambers, 883 S.W.2d 650, 654 (Tex. 1994). 
However, the decision to pursue a particular suspect, as well as other decisions made during the
course of the pursuit such as which route to follow, what speed to travel, whether to call for backup,
and how closely to follow the fleeing vehicle, involve the officer’s discretion. Id. at 655.
            To obtain summary judgment on good faith in a pursuit case, a law enforcement officer must
prove that a reasonably prudent officer, under the same or similar circumstances, could have believed
that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in
continuing the pursuit. Clark, 38 S.W.3d at 581. The officer need not prove that all reasonably
prudent officers would have continued the pursuit. Id. The officer must prove only that a reasonably
prudent officer might have believed that he should have continued the pursuit. Id.
            The need element refers to the “urgency of the circumstances requiring police intervention”
or “the seriousness of the crime or accident to which the officer responds, whether the officer’s
immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what
alternative courses of action, if any, are available to achieve a comparable result.” Wadewitz v.
Montgomery, 951 S.W.2d 464, 467 (Tex. 1997). The risk element of good faith refers to “the
countervailing public safety concerns” or “the nature and severity of harm that the officer’s actions
could cause (including injuries to bystanders as well as the possibility that an accident would prevent
the officer from reaching the scene of the emergency), the likelihood that any harm would occur, and
whether any risk of harm would be clear to a reasonably prudent officer.” Id. An officer acts in bad
faith only if he could not have reasonably reached the decision in question. Clark, 38 S.W.3d at 581.
            To controvert an officer’s summary judgment proof on good faith, the nonmovant must do
more than show that a reasonably prudent officer could have decided to stop the pursuit. Id. The
nonmovant must show that no reasonable person in the officer’s position could have thought that the
facts justified the officer’s acts. Id. The court must consider the rights of bystanders or other
innocent parties if an officer acts in gross disregard of public safety. Chambers, 883 S.W.2d at 656.
 
The Record
            None of the parties question whether both officers were performing discretionary duties and
all seem to agree they were acting within the scope of their employment. Therefore, our review shall
focus on the good faith element of immunity. 
Evidence in Support of Appellants’ Motion
            Appellants submitted affidavits of Loftin, Evans, and Sergeant Don Worthington, a DPS
accident investigator, and excerpts from Loftin’s deposition testimony. We first survey this evidence
and identify that which addresses the need to pursue the Ford Probe and immediately apprehend its
occupants. 
            In his January 5, 2005 affidavit, Loftin stated that the Probe was going seventy-four miles
per hour in a fifty-five mile per hour zone. Loftin observed that the back left window was broken
leading him to believe the car might be stolen. Although the driver turned and looked directly at the
troopers, he accelerated and ran a stop sign instead of stopping for the officers. The Probe traveled
on several different roads, including roads going through a golf course, at a high rate of speed. The
Probe entered Shadybrook, a rural residential community, continuing to disregard stop signs and
drive recklessly. The Probe drove through the yard of a private residence causing Loftin to believe
the suspects might attempt to exit their vehicle, dispose of contraband, or endanger residents of the
subdivision. Loftin explained that, due to the Probe’s dangerous and reckless manner of operation,
including disregard of stop signs and trespassing, and the suspect’s evasion of arrest, he believed that
the suspect vehicle posed an immediate danger to the public and needed to be apprehended. He
explained that the violations of law that he observed “threatened the safety of the many people who
were in or potentially in the area and/or on the roads.” 
            In his January 5, 2005 affidavit, Evans stated that the Probe was speeding and they pursued
the Probe when it failed to stop. He explained that during the pursuit, he saw two or three small,
brown, square objects come out of the passenger window. He thought those were probably
controlled substances or other contraband. During the pursuit, the driver of the Probe drove in a
reckless manner, committing many traffic violations that “threatened the safety of the many people
who were in or potentially in the area and/or on the roads.” Evans described the driver of the Probe
as an “immediate danger to the public.” Evans believed that the suspect’s reckless operation of his
vehicle and the suspected criminal conduct necessitated an immediate stop to avert any threat of
harm to persons in or near the area or the roadway.
            Next, we identify the evidence regarding the risk to the public posed by the high-speed chase. 
Loftin described Shadybrook as a “sparsely populated rural community”and stated that “there were
several stretches where there were no homes at all.” Loftin said there was almost no traffic, very few
homes, and few visible pedestrians. He saw one man standing beside the roadway inside
Shadybrook and never saw any pets or children. He saw the driver of a utility truck pull over to the
right and get out of his truck. Loftin described the roads in Shadybrook as rough. He said they made
numerous right and left turns and he never achieved a high rate of speed in the subdivision. He felt
that any risk to the public significantly diminished inside Shadybrook because little to no pedestrian
traffic or vehicular traffic was observed during the pursuit in the subdivision. He explained that the
risk of pursuing the Probe into the subdivision was minimal in comparison to the risk of allowing
the continued reckless operation of that vehicle. Loftin noted that at all times his siren and
emergency lights were operating to notify the public of their presence. Loftin stated that, “at all
times, [he] maintained a safe speed under the circumstances and took all reasonable and prudent
measures to effectuate the stop without unnecessarily endangering the safety of persons in the area
or on the roadways.” Loftin testified in his deposition that he did not see any speed limit signs in
Shadybrook.
            In his deposition Loftin said, “There wasn’t a need to apprehend him.” He also said, “It’s
not like chasing somebody down through the middle of the city of Tyler, it wasn’t like that. So I
didn’t see any danger down there at all until – until this happened.” In his January 5, 2005 affidavit,
Loftin explained that these statements were meant to address his assessment of the circumstances
surrounding his decision to continue the pursuit in Shadybrook, not his assessment of the continued
need to apprehend the suspect.
            The following deposition testimony sums up Loftin’s thoughts on balancing need and risk:
 
              [Counsel]:            [I]s it accurate to say that you didn’t feel like there was an
immediate danger that was going to be caused if you did not
apprehend him?
 
              [Loftin]:                That’s correct.
 
              [Counsel]:            Okay. Given that feeling, if you had felt that your pursuit of this
suspect presented a clear risk to the public, would you have
broken it off?
 
              [Loftin]:               Yes, sir.
 
              [Counsel]:            Okay. And the reason you would have broken it off is because
you didn’t feel that the need to apprehend this suspect would
have outweighed that clear risk to the public?
 
              [Loftin]:               That’s correct.


            Referring to that testimony in his January 5, 2005 affidavit, Loftin clarified that he was
addressing his assessment of the circumstances surrounding his decision to continue the pursuit in
Shadybrook and not his assessment of the continued need to apprehend the suspect. He reiterated
that it was his belief that the need to apprehend the suspect outweighed a diminished risk to the
public in Shadybrook in continuing the pursuit.
            Evans stated in his affidavit that vehicular traffic was light. Due to the rough condition of
the roads in Shadybrook, they never reached high speeds inside the subdivision. He only saw one
man on the side of the road in the subdivision. Most of the houses in the sparsely populated
subdivision were at a distance from the roadway. He stated that the potential risk of harm to people
in the area because of the pursuit was minimal.
            During the chase, Evans reported the Probe’s license plate number to dispatch, and dispatch
gave the troopers the name of the registered owner. Loftin explained in his deposition that, at one
point, he attempted to use the squad car to hit the Probe’s right, rear corner to “spin him out.” He
missed, ran off the road, and hit a stop sign. He denied losing control of his vehicle.
            Willingham investigated the accident and prepared an affidavit setting out the facts of the
incident. Before entering Shadybrook, the chase covered six miles of farm-to-market and county
roads, including a county road through a golf course. That portion of the chase lasted five minutes. 
The portion of the chase within Shadybrook lasted twenty-two minutes and covered nine and seven-tenths miles. The chase covered numerous streets within the subdivision. Both vehicles disregarded
numerous stop signs in the subdivision. Willingham described the street where the wreck occurred
as “a narrow oil sand road with heavy foliage on both sides” that blocked Loftin’s view of vehicles
approaching intersections. 
Evidence in Support of Morales’s Response
            Morales filed a response to Appellants’ motion supported by affidavits of Morales, Loftin,
Evans, and David A. Lysek, an accident investigator retained by Morales as an expert witness, and
the complete deposition testimony of Loftin and Evans. 
            In his deposition testimony, Loftin admitted that he was not familiar with the subdivision and
did not see the stop sign at the intersection where the accident occurred. He did not know how fast
he was going and did not think it was sixty miles per hour, but had no reason to dispute Evans’s
statement that they were going fifty to sixty miles per hour. Before entering Shadybrook, he thought
they traveled sixty to eighty miles per hour. He believed they were going thirty miles per hour when
they drove in the yard between two houses. The officers learned during the chase that the Probe had
not been reported stolen. When questioned by the State, Loftin said he did see a need to apprehend
and he did not see any clear risk of danger in continuing the pursuit. In a separate statement, labeled
Deposition Exhibit 1 and dated June 30, 2001, Loftin explained that his speed decreased greatly in
the subdivision due to road surface and visibility. He said there were two long stretches in the
subdivision where possibly they reached higher rates of speed.
            In an affidavit dated May 21, 2003, Loftin described the events of the day of the accident that
occurred two years before. This affidavit contains the information that is in his January 2005
affidavit, but in less detail.
            In his deposition testimony, Evans explained that he had graduated from the Department of
Public Safety’s academy in March 2001 and was in training at the time of the accident. He stated
they traveled up to ninety or one hundred miles per hour on FM 344 and in the sixties or maybe
seventy miles per hour on County Road 187 inside Eagles Bluff. During the pursuit, they learned
the name of the car’s registered owner and that the car was not reported stolen. Evans had never
been in Shadybrook before and did not know it was a residential area when they entered the
subdivision. He explained that they slowed down “a good bit” and the roads in Shadybrook are
rough, oil blacktop roads. Evans assumed that they were going fifty or fifty-five miles per hour
through Shadybrook. He guessed that they were going thirty miles per hour when they drove through
the yard between two houses. He admitted that seemed like a dangerous thing to do and there might
be kids playing. He agreed that thirty miles per hour would be a reasonable speed in a subdivision
due to the road conditions and sight restrictions. While he did not see the speedometer, he thought
they were going fifty or sixty miles per hour at impact with Morales’s vehicle.
            Exhibit 1 to Evans’s deposition is a sworn statement by Evans dated June 7, 2001. He
explained that on May 14, 2001, at approximately 10:30 a.m., he and Loftin were conducting a
stationary radar check when a Ford Probe sped past them. Evans described the pursuit and stated
that he saw two or three brown, square objects come out of the passenger-side window. During the
chase, dispatch gave him the name of the Probe’s registered owner. Evans stated “there was light
vehicular traffic in Shadybrook with rough roads, and therefore I feel the speeds of the Ford Probe
and our patrol car could not have reached high speeds.” He explained that at one point he feared the
occupants of the Probe might abandon the vehicle and enter one of the homes. He described running
over a stop sign, going into the ditch, and accelerating again on Jason Street. While driving down
this street, he saw a slow moving blue object enter their path from the left and felt the impact.
            Evans’s May 21, 2003 affidavit is identical to the January 2005 affidavit described above.
            Morales’s expert, David A. Lysek, investigated the accident. He concluded that driving at
speeds up to one hundred miles per hour on a farm-to-market road presents a clear risk of injury or
death to the public and driving between fifty and sixty miles per hour in a residential subdivision,
disregarding stop signs, and entering a blind intersection at fifty or sixty miles per hour creates a very
clear risk of serious personal injury or death to the public. In Lysek’s opinion, no reasonably prudent
peace officer could believe that the pursuit of May 14, 2001 did not create a risk of serious harm. 
Relying on Loftin’s statement that he did not believe there was an immediate need to apprehend the
driver of the Probe, Lysek stated that no reasonably prudent peace officer who believes that the
immediate apprehension of a suspect is not necessary would engage in a high speed pursuit or
believe that a high speed pursuit in a residential subdivision was justified.
            Lysek reported that the entry of Shadybrook clearly marked it as a gated subdivision and it
was obvious that it was a residential area. He described the roadways as narrow. When two cars
meet from opposite directions, both vehicles must move to their right and drive on the shoulder or
grassy area. Speed limit signs indicated a thirty mile per hour limit in the subdivision. Vegetation
in the subdivision caused “blind corners” at intersections. He noted that a vehicle failing to stop for
the stop sign at the intersection where the wreck occurred would not have time to react for traffic
even at thirty miles per hour. Witnesses stated that they observed the patrol car traveling between
sixty and seventy miles per hour in the residential area. Lysek stated that a speed of sixty miles per
hour is supported by the physical evidence.
 
Analysis
            With regard to the need element, the officers are required to show they considered the
“urgency of the circumstances” and the “seriousness of the crime” involved as if applying a sliding
scale of need based on how heinous the crime or how contemptible the criminal. Here, the original
crime to which the officers responded was a traffic violation, speeding nineteen miles per hour over
the limit. Although the officers did not know who was driving the Probe, they knew to whom the
car was registered. Even though Loftin suspected the car was stolen, the officers knew the Probe had
not been reported stolen. Although speeding, there was no evidence that the suspect drove recklessly
prior to the onset of the chase. See Tex. Transp. Code Ann. § 545.401(a) (Vernon 1999) (A person
commits an offense if the person drives a vehicle in wilful or wanton disregard for the safety of
persons or property.). When the officers attempted to stop the Probe, the suspect quickly violated
additional laws, creating a danger to the public in the process. It is an offense to flee from a peace
officer attempting a lawful arrest or detention. Tex. Pen. Code Ann. § 38.04(a) (Vernon 2003). 
Nonetheless, there was no evidence that, at the time the chase was initiated, the circumstances were
of such urgency that taking the suspect into custody immediately was necessary. See Wadewitz, 951
S.W.2d at 467. 
            Morales targets Loftin’s statements that there was not a need to apprehend the driver of the
Probe and that he did not feel it would cause an immediate danger if he did not apprehend the driver,
claiming these statements defeat Appellants’ assertion that there was a need to apprehend the driver
of the Probe. When considering whether Appellants met their burden on the need element in the
summary judgment proceeding, these statements are not determinative. A party’s testimonial
declarations that are contrary to his position are quasi-admissions. Hennigan v. I.P. Petroleum Co.,
858 S.W.2d 371, 372 (Tex. 1993). Such admissions are to be distinguished from judicial
admissions, which are a formal waiver of proof. Id. The requirements for treating a party’s
testimonial quasi-admission as a conclusive judicial admission include that the statement be
“deliberate, clear, and unequivocal” and that “the hypothesis of mere mistake or slip of the tongue
must be eliminated.” Id. Here, Loftin made statements that appear to be contrary to his position. 
He then attempted to explain his meaning, indicating that he was referring to his decision to continue
the pursuit, not the need to apprehend. It cannot be said that his admissions are clear and
unequivocal. They may well be a slip of the tongue. As quasi-admissions, these statements are
merely some evidence and not conclusive. Id. Accordingly, the evidence indicates that while the
officers had reason to stop the Probe, the circumstances did not indicate an urgent need for police
intervention as required by Wadewitz. See Wadewitz, 951 S.W.2d at 467. 
            The officers noted that both vehicular and pedestrian traffic was light. They downplayed the
fact that the majority of the chase took place in a residential neighborhood, which had lower speed
limits than the farm-to-market and county roads they had traveled on. This particular neighborhood
was characterized by rough, narrow roads and blind intersections with only two-way stops. Although
Loftin said he never reached a high rate of speed in the subdivision, he did not dispute Evans’s
estimate that they were going fifty to sixty miles per hour, which is up to twice the posted limit.
Loftin’s conclusory statement that he maintained a safe speed and took all reasonable and prudent
measures to stop the Probe without unnecessarily endangering the safety of people in the area does
not establish good faith. See Clark, 38 S.W.3d at 581; Brownlee v. Brownlee, 665 S.W.2d 111, 112
(Tex. 1984) (Affidavits consisting of conclusions are incompetent summary judgment evidence.). 
With the possible exception of the failed “spin out” attempt, which is never described by Loftin as
an alternative to pursuit, the evidence provides no indication that the officers considered any
alternatives to pursuit. Accordingly, the evidence does not reflect facts to show the officers assessed
the possibility that there were any alternatives to pursuit as required to show good faith. See Clark,
38 S.W.3d at 587-88.
            Further, police pursuits require a reassessment of whether to continue the pursuit in response
to changing circumstances during the pursuit. Id. at 583. This chase lasted for twenty-seven minutes
over country roads, through a golf course, and throughout a residential area. The evidence does not
indicate that the officers reassessed the need to continue the pursuit when they reached the entry to
Shadybrook. Loftin stated in his January 5 affidavit that his deposition testimony referenced his
“assessment of the circumstances surrounding [his] decision in continuing the pursuit in
Shadybrook.” The referenced testimony was vague and conclusory. His statements are not fact
based and do not indicate a reassessment. Evans admitted that driving thirty miles per hour between
houses was dangerous. Neither Loftin nor Evans stated that he considered the likelihood of the risk
of a collision with a third party. See id. at 585. With the exception of stating that they slowed down
in Shadybrook, the officers said little about road conditions or the impact of rough, narrow roads
with poor visibility. See id. at 586. Further, the officers’ lack of familiarity with the streets is a
factor to be considered. See id. 
            We recognize that in applying the good faith test, we are not to penalize an officer for his
inability to perceive or evaluate a risk due to circumstances beyond his control and that officers are
not necessarily forbidden from pursuing suspects for traffic violations or in residential areas. See
id. at 583. Additionally, an officer’s inability to thoroughly analyze each need or risk factor should
not alone prevent him from establishing good faith. See id. Nevertheless, we conclude that neither
Loftin nor Evans adequately addressed the degree, likelihood, and obviousness of the risks created
by the twenty-seven minute high speed chase. See Wadewitz, 951 S.W.2d at 467. 
            We are required to take as true evidence favorable to the nonmovant, indulge reasonable
inferences in favor of the nonmovant, and resolve doubts in favor of the nonmovant. See Nixon, 690
S.W.2d at 548-49. After noting that the Probe was traveling seventy-four miles per hour in a fifty-five mile per hour zone and surmising that the vehicle might be stolen, the officers began what
would turn out to be an unfruitful and injurious twenty-seven minute chase. While we are aware that
the work of law enforcement is difficult and officers must make decisions under arduous
circumstances, we cannot agree that Appellants met their burden under the facts of this case. 
Appellants’ evidence did not establish as a matter of law that a reasonably prudent officer, under the
same or similar circumstances, could have believed that the need to immediately apprehend the
speeding suspect outweighed a clear risk of harm to the public in continuing the pursuit in the
residential area. See Clark, 38 S.W.3d at 581.
 
Conclusion
            We cannot say that Appellants established their entitlement to summary judgment as a matter
of law. Id. Accordingly, the trial court did not err in denying their motion for summary judgment. 
We overrule Appellants’ sole issue.
 
 
 
            We affirm the trial court’s order.
 
                                                                                                    SAM GRIFFITH 
                                                                                                               Justice
 
Opinion delivered December 14, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and Ramey, Retired Chief Justice, Twelfth Court of Appeals, Tyler,
sitting by assignment.

































(PUBLISH)