**Reversed and Rendered and Memorandum Opinion filed March 5, 2019.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

## NO. 14-18-00182-CV

### HARRIS COUNTY, Appellant

### V.

### JUANA AVILA, INDIVIDUALLY AND AS NEXT FRIEND OF K.A., A MINOR, AND K.A., INDIVIDUALLY, Appellees

**On Appeal from the 165th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2016-60506**

## MEMORANDUM OPINION

In this interlocutory appeal from an order denying a plea to the jurisdiction, the question is whether a governmental unit conclusively established that it is protected by governmental immunity. For reasons explained more fully below, we conclude that it did. We therefore reverse the trial court's order and render judgment dismissing the case for want of jurisdiction.

## BACKGROUND

This personal-injury action arises from damages sustained when a sheriff's deputy collided with Juana Avila and a related individual (collectively "Avila"), during the deputy's high-speed pursuit of a fleeing suspect.

The pursuit began when the suspect's vehicle quickly departed a corner store at the very moment that the deputy arrived there in his marked patrol car. The deputy decided to follow the vehicle, suspecting that the reason for the departure was related to the presence of law enforcement.

The suspect headed towards a tollway, where the suspect crossed two lanes of traffic without signaling. The deputy activated his emergency lights in an attempt to conduct a traffic stop, but the suspect refused to stop, and accelerated instead to speeds exceeding 100 miles per hour. The deputy then activated his siren and notified his dispatcher of the high-speed pursuit.

The suspect eventually exited the tollway and proceeded to a major thoroughfare, where the deputy remained in pursuit. Even though the speed limit on the thoroughfare was only 45 miles per hour, the deputy traveled as fast as 80 miles per hour. Other vehicles on the thoroughfare became aware of the chase and pulled over to the right-hand lane to allow for the deputy's safe travel. Avila, however, came to a complete stop in the left-hand lane, where the deputy had been traveling. Once he realized that he could not maneuver around Avila, the deputy slammed on his brakes.

The deputy rear-ended Avila at an unknown speed, but a data recorder on his patrol car indicated that he had been traveling at 11 miles per hour just 2.5 seconds before impact. The deputy called EMS to the scene of the collision, but no one was transported to the hospital.

Avila sued Harris County, the deputy's employer, on a theory of negligence under the Texas Tort Claims Act. The County responded with a plea to the jurisdiction, arguing that its immunity from suit had not been waived. More specifically, the County argued that it could not be vicariously liable for the deputy's negligence because the deputy himself was protected by official immunity. In an alternative ground for relief, the County argued that it was exempted under the Act because Avila's claim for damages arose from the deputy's reaction to an emergency situation.

After Avila filed a response, the trial court denied the plea to the jurisdiction. The County then brought this interlocutory appeal.

**STANDARD OF REVIEW**

To prevail on its plea to the jurisdiction, the County had the initial burden of negating the existence of jurisdictional facts and of conclusively establishing that the trial court lacked subject-matter jurisdiction. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004). If that burden was satisfied, the burden then shifted to Avila to present evidence sufficient to raise a genuine issue of material fact regarding the jurisdictional issue. *Id.* at 227–28. This standard essentially mirrors that of a traditional motion for summary judgment. *Id.* at 228. Consistent with that standard, we review the trial court's ruling de novo, and we consider all evidence presented in the light most favorable to Avila, the nonmovant. *Id.*

**ANALYSIS**

Even though the County asserted two grounds for relief in its plea to the jurisdiction, we only address the first ground relating to the deputy's official immunity because that ground is dispositive. *See* Tex. R. App. P. 47.1.

3

We begin with a general overview of immunity.

## I. Immunity

Under the common law doctrine of sovereign immunity, the state is immune from suit, which means that it cannot be sued without its consent. *See City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011). Governmental units in the state enjoy the same type of immunity, although their immunity is known as "governmental immunity." *See Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006).

The County is a governmental unit, which means that it cannot be sued absent a waiver of its governmental immunity. *See Harris County v. Annab*, 547 S.W.3d 609, 613 (Tex. 2018). One such waiver can be found under the Texas Tort Claims Act, which provides that a governmental unit is liable for the tort of an employee, if the tort arises out of the operation of a motor vehicle and "the employee would be personally liable to the claimant according to Texas law." *See* Tex. Civ. Prac. & Rem. Code § 101.021(1)(B).

A governmental employee cannot be personally liable, however, if he is protected under the common law doctrine of official immunity. *See DeWitt v. Harris County*, 904 S.W.2d 650, 653 (Tex. 1995). That doctrine is born out of "the necessity of public officials to act in the public interest with confidence and without the hesitation that could arise from having their judgment continually questioned by extended litigation." *See Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex. 2004).

An employee's official immunity therefore becomes relevant to the liability of his employer: a governmental unit "is vicariously liable for the acts of its

employees only to the extent its employees are not entitled to official immunity." *See K.D.F. v. Rex*, 878 S.W.2d 589, 597 (Tex. 1994).

The County argued in its plea to the jurisdiction that the deputy in this case was entitled to official immunity. If the County conclusively proved that defense, then the deputy's official immunity would negate an essential jurisdictional fact, thereby depriving the trial court of subject-matter jurisdiction.

To prove the official immunity defense, the County had the burden of establishing the following essential elements: (1) the deputy was acting within the scope of his employment, (2) the deputy was performing a discretionary duty, and (3) the deputy was acting in good faith. *See City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). Avila concedes that the County met its burden with respect to the first two elements. Therefore, we only address the third element. *See Telthorster v. Tennell*, 92 S.W.3d 457, 461 (Tex. 2002).

## II.    Good Faith

To establish that an officer acted in good faith in a case involving the pursuit of a fleeing suspect, the defendant must establish that "a reasonably prudent officer under the same or similar circumstances could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing (rather than terminating) the pursuit." *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997).

The evidence in support of good faith must adequately address both the need and the risk aspects of this test. *Id.* at 467. "Need" refers to the urgency of the circumstances requiring police intervention, and is determined by factors such as (1) the seriousness of the crime or accident to which the officer responds; (2) whether the officer's immediate presence is necessary to prevent injury or loss

5

of life or to apprehend a suspect; and (3) what alternative courses of action, if any, are available to achieve a comparable result. *Id.* "Risk" refers to the countervailing public safety concerns, such as (1) the nature and severity of harm that the officer's actions could cause, including injuries to bystanders as well as the possibility that an accident would prevent the officer from reaching the scene of the emergency; (2) the likelihood that any harm would occur; and (3) whether any risk of harm would be clear to a reasonably prudent officer. *Id.*

Under these factors, the defendant claiming good faith does not have to prove that an officer would have acted unreasonably by stopping the pursuit, or that all reasonably prudent officers would have continued the pursuit. *See Chambers*, 883 S.W.2d at 657. Rather, the defendant need only prove that a reasonably prudent officer might have believed, after weighing the needs and risks, that the pursuit should have been continued. *Id.* at 656–57 & n.7 (analogizing this standard to an abuse of discretion standard of review). If the defendant conclusively establishes that point, then the burden shifts to the plaintiff to show that no reasonable person in the officer's position could have thought that the facts were such that they justified the officer's actions. *Id.* at 657.

## III.    The County's Plea

The County supported its claim of good faith with affidavits from the deputy and from a chief of police.

### A.    The Deputy's Affidavit

The deputy testified that he has been a peace officer for more than seven years. During the length of his career, he has been involved in more than 200 pursuits, none of which ever resulted in a collision until the pursuit involved in this case.

6

On the day of the collision, the deputy testified that he had been assigned to the Community Action Team, which is tasked with patrolling and conducting surveillance in high-crime areas. The corner store where the pursuit began was located in one such area.

The deputy testified that he saw the suspect's vehicle parked along a guard rail, in an unmarked parking spot just outside the corner store. When the vehicle quickly departed, the deputy suspected that the departure was related to his presence, given the area's high reputation for crime.

The deputy testified that he activated his emergency lights on the tollway once he saw the suspect cross two lanes of traffic without signaling. When the suspect sped off at more than 100 miles per hour, the deputy activated his siren and notified his dispatcher, who informed him that the pursuit was a "priority one call." The dispatcher also said that a supervisor was en route as a backup, but that the deputy was "the primary unit in the vehicle pursuit."

The deputy continued his pursuit, opining that "the suspect's hazardous driving created a danger to the public that required [the deputy's] intervention and which clearly outweighed the risks of a vehicle pursuit." In explaining the risks of his pursuit, the deputy observed that traffic was light on the tollway. The time was approximately 7:00 p.m., the lanes were well-lit and dry, and the weather was clear.

The deputy testified that he remained vigilant of the traffic and weather conditions as the pursuit progressed. The deputy said that he reduced his speed when the tollway became congested. He traveled in an unoccupied lane when proceeding through a toll booth area. And he waited for other motorists to yield before changing lanes himself.

When the suspect exited the tollway and headed towards the major thoroughfare, the deputy followed course. The deputy testified that he was "very familiar" with the thoroughfare because he traveled down it often.

The speed limit on the thoroughfare was 45 miles per hour, but the deputy traveled at speeds between 15 miles per hour and 80 miles per hour. The deputy testified that he was aware that speeding increases the chances of causing an accident, in part because speeding reduces the time available for braking to avoid another vehicle, but the deputy believed that he could safely speed under the circumstances. The deputy explained that he was continuously monitoring the weather conditions, which were the same as on the tollway. The deputy also said that he was continuously monitoring the traffic conditions, noting that congestion was moderate to reduced, depending on the location.

The deputy remarked that his decision to speed was also informed by his belief that other vehicles were aware of his approach. The deputy noted that visibility was good, that his emergency lights and siren were engaged, and that at least seven other vehicles had pulled over to the right-hand lane to allow for his safe travel.

The deputy testified that he collided with Avila because she "suddenly applied her brakes and brought her vehicle to a stop in the left lane of traffic," which is where he had been driving. "When she failed to move to the right and made her sudden stop," the deputy explained that he "had no choice but to continue straight as there was no median and due to the vehicles on [his] right and oncoming traffic to the left."

At the time of the collision, the deputy had been in pursuit of the fleeing suspect for approximately two minutes.

The deputy testified that he was aware that he could have abandoned his pursuit or reduced his speed earlier, but he believed that apprehending his suspect was necessary in this case. The deputy explained that a person who is fleeing in an automobile is "a serious matter." The deputy speculated that his suspect may have committed a serious offense before the pursuit. The deputy was also concerned that the suspect's hazardous driving could cause an accident with another vehicle. The deputy accordingly believed that it was important to contain the suspect and prevent harm to others.

Based on the foregoing facts, the deputy opined that his pursuit was justified and that a reasonably prudent officer in the same or similar circumstances could have believed that the need to apprehend the fleeing suspect was outweighed by the risks to the public. This evidence was uncontroverted.

B.     The Chief's Affidavit

The other affidavit in support of the County's position was from a retired chief of police, who had over thirty-three years of experience in law enforcement. During his time on the force, the chief reviewed more than 700 accidents involving police officers to determine if disciplinary measures were warranted. After reviewing the record in this case, which included a dash cam video of the deputy's pursuit, the chief concluded that the deputy's actions were justified.

The chief first testified that the deputy had probable cause to stop the suspect after the deputy observed a moving violation. The chief then testified that the deputy had a duty to pursue the suspect when the vehicle sped away, rather than stopped. The chief explained that the need for the deputy's pursuit was rooted in the suspect's hazardous driving, which presented a danger to others.

The chief also opined that the deputy had acted with due regard for innocent bystanders. The chief noted that the deputy did not replicate the suspect's hazardous driving. For example, the suspect cut off other motorists, whereas the deputy yielded, especially when approaching critical junctures. The chief also noted that the deputy notified his dispatcher in an effort to garner more manpower, that he activated his emergency lights and siren, and that he continuously monitored the traffic and weather conditions. The chief believed that there was no change in circumstances over the course of the pursuit that would have required the deputy to abandon his chase.

Like the deputy, the chief also noted that a reduced speed would have been an alternative course of action, but the chief believed that the suspect needed to be stopped as soon as possible, and that speeding was not unsafe under the particular circumstances of the deputy's pursuit.

The chief opined that a reasonably prudent officer under the same or similar circumstances could have believed that the need to take the deputy's course of action outweighed the risks of harm to the public. This opinion was uncontroverted.

## C. Application of Law to Facts

Opinion testimony on good faith must address what a reasonable officer "could have believed" under the circumstances—not what a reasonable officer "would have done"—and the testimony must be substantiated with facts showing that the officer involved in the case assessed both the need to apprehend the suspect and the risk of harm to the public. *See Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 644 (Tex. 2015) (per curiam) (explaining that evidence of negligence will not controvert competent evidence of good faith). The testimony here meets that standard.

The County produced evidence showing that the deputy had a need to pursue his suspect, based on a series of escalating events. There was evidence that the suspect was in a high-crime area and acting suspiciously. The suspect later crossed two lanes of traffic without signaling, which had the effect of cutting off other motorists. The suspect then refused to stop when the deputy activated his emergency lights, accelerating instead to speeds exceeding 100 miles per hour. The deputy testified that a suspect fleeing under these circumstances is "a serious matter" because the suspect may cause an accident with another vehicle.

The County further showed that the deputy's immediate presence was necessary to apprehend the suspect and prevent injury to others because the deputy was the only official in direct pursuit of the suspect. Even though a supervisor was en route, the deputy remained "the primary unit in the vehicle pursuit."

The County also showed that the deputy had considered alternative courses of action, such as abandoning his pursuit or reducing his speed. The deputy testified that a reduced speed would have reduced the chances of a collision, but it would have also impeded the deputy's effort to contain the suspect, whose hazardous driving already presented an immediate danger to others.

As for the risks, the County showed that the deputy was aware that speeding increased his chances of causing a collision, but that the deputy believed that speeding was not unsafe under the circumstances. The deputy was "very familiar" with the major thoroughfare where the collision occurred. The weather was clear, the roads were well-lit, and traffic congestion was moderate to light. Also, the deputy had activated his emergency lights and siren, and other vehicles had pulled over to allow for the deputy's safe travel.

Based on this evidence, we conclude that the County met its burden of showing that a reasonably prudent officer, under the same or similar circumstances,

could have believed that the need to apprehend the suspect outweighed the risks of harm to the public. *See City of San Antonio v. Ytuarte*, 229 S.W.3d 318, 321 (Tex. 2007) (per curiam) (the evidence established good faith as a matter of law where there was expert testimony that the officer had evaluated both the needs and risks).

## IV. Avila's Response

Having concluded that the County satisfied its initial burden of showing that the deputy acted in good faith, we must now determine whether Avila raised a genuine issue of material fact in her response. To controvert the County's evidence of good faith, Avila was required to show more than just that a reasonably prudent officer could have decided to stop the pursuit. *See Chambers*, 883 S.W.2d at 657. Her burden was much more demanding: she had to show that no reasonable officer in the deputy's position could have thought that the facts justified the deputy's actions. *Id.*

Avila only attached two exhibits to her response. The first exhibit was an unredacted copy of the crash report, which had also been attached to the County's plea to the jurisdiction (except that the County's copy was in redacted form). The second exhibit was a copy of Avila's original petition. Neither one of these exhibits contains any opinion testimony that controverts the County's evidence of good faith.

In the absence of any controverting evidence of her own, Avila suggests on appeal that the County's evidence was legally insufficient to establish good faith. Avila begins by pointing out that the deputy speculated in his affidavit as to the reason why his suspect left the parking lot of the corner store. Because the deputy did not actually know the reason why the suspect departed, Avila suggests that there was no need for the deputy's pursuit. This argument fails because the deputy personally observed other violations, from the suspect's illegal lane change to the

12

suspect's evading detention, which did justify a pursuit. Indeed, the chief testified that, under those facts, the deputy had a duty to pursue his suspect.

Avila acknowledges these other facts, but she argues that committing a traffic violation in the presence of an officer is not serious or urgent enough to warrant a high-speed pursuit. This argument is also meritless. When the deputy witnessed the illegal lane change, he attempted to initiate a routine traffic stop, but the suspect evaded detention, which is a felony when committed in a vehicle. *See* Tex. Penal Code § 38.04(b). More importantly, the evidence showed that the suspect had accelerated to speeds exceeding 100 miles per hour, which presented a clear danger to the public that was serious and urgent enough to justify a pursuit. *See Univ. of Houston v. Clark*, 38 S.W.3d 578, 586 (Tex. 2000) (the evidence established good faith as a matter of law where the officer pursued a suspect who was fleeing at an estimated 80 to 90 miles per hour).

Avila also suggests that there was no need for a pursuit once the deputy was told by his dispatcher that backup was on the way. Avila cites to no authority for this proposition, which would be contrary to binding precedent, as the evidence showed that the deputy was the only officer in visible pursuit of the suspect. *See Wadewitz*, 951 S.W.2d at 467 (considering whether the officer's presence is necessary to apprehend the suspect). And as the chief plainly testified, there was no change in circumstances that would have required the deputy to abandon the chase.

Avila argues next that the deputy could not have had a need for his pursuit because he had no information regarding the identity of his suspect. Once again, this argument fails. *See Clark*, 38 S.W.3d at 585 (the evidence established good faith as a matter of law despite the fact that "the suspect had not been identified before he fled"). The deputy did not need to obtain the identity of his suspect to know that the suspect already posed a danger to others, given the suspect's hazardous driving.

13

Avila finally argues that the trial court's ruling should be upheld because the circumstances of the deputy's pursuit are similar to those in *Loftin v. Morales*, 187 S.W.3d 533 (Tex. App.—Tyler 2005, no pet.), which held that an officer's good faith had not been established as a matter of law. But *Loftin* is distinguishable on the facts. The officer there made statements in his deposition that were contrary to his own position, *id.* at 541, whereas the deputy here was never contradicted or inconsistent. Also, the court of appeals in *Loftin* concluded that the officer had failed to prove good faith because there was no evidence that the officer had considered any alternatives to pursuit, or that he had reassessed the need for his pursuit as the pursuit progressed over twenty-seven minutes and through different neighborhoods. *Id.* at 542. Here, by contrast, there was evidence on both subjects. The deputy testified that he had considered his alternatives, and that he had continuously monitored the weather and traffic conditions as his much shorter pursuit changed course from the tollway to the thoroughfare. Accordingly, *Loftin* does not control the outcome of this case.

## CONCLUSION

We conclude that the County satisfied its burden of showing that the deputy was entitled to official immunity, and that Avila failed to present any controverting proof. Because the deputy's official immunity negates an essential jurisdictional fact, we further conclude that the trial court erred by denying the County's plea to the jurisdiction. We therefore reverse the trial court's order and render judgment dismissing Avila's suit for want of jurisdiction.

/s/    Tracy Christopher
Justice

Panel consists of Justices Christopher, Jewell, and Hassan.

14